UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

vs.                                           2:12-cr-26-FtM-29DNF

STEPHEN M. LOVELL

_____

## ORDER REGARDING COURT'S SENTENCING DETERMINATIONS

This matter came before the Court on August 5, 2013, for a sentencing hearing. Defendant objects to all the enhancements to the base offense level proposed in the Presentence Report. The government bears the burden of establishing each enhancement by a preponderance of the evidence. Pursuant to Fed. R. Crim. P. 32(i)(3)(B), the Court makes its determinations regarding pending objections to the Presentence Report.

The Court finds that the government has established the following relevant material facts by at least a preponderance of the evidence:

In approximately 2007, Karen Carmona Jackson (Jackson) and her husband Ernesto Diaz (Diaz) were the victims of an actual car accident. Jackson testified they went to the Latin Diagnostic Rehabilitation Center clinic in Cape Coral, Florida because they were both paid money by the clinic for obtaining treatment. Jackson then became employed as a front desk receptionist at the

Latin Diagnostic Rehabilitation clinic, where she met Dr. Stephen M. Lovell (defendant or Dr. Lovell). During Jackson's two year tenure, she observed fraudulent activities by the clinic involving billing insurance companies for patient visits or treatments which never occurred or were unnecessary.

In late 2009, Jackson proposed, and Diaz, Francisco Huici Fernandez (Huici), and Jeanine Lastres (Lastres) agreed, to open a similar clinic in order to fraudulently obtain money from insurance companies by filing false claims with insurance companies for health care treatment. None of these co-conspirators had prior experience setting up or running such a clinic. They knew that their clinic needed a doctor with a Florida license, so Jackson asked Dr. Lovell if he wanted to open such a clinic.

Jackson, Huici, Lastres, and Diaz met with Dr. Lovell outside a restaurant to discuss opening a clinic. At the meeting they discussed using a corporation, how to open a clinic, the need to find a location, the need to find a name, and that they already had all the equipment. Dr. Lovell stated that Jackson would be the office manager because he trusted her from her former job. Because Huici's $40,000 investment was not enough money to open the clinic, they asked for and received a $20,000 loan from Dr. Lovell to help open the clinic. They agreed that Dr. Lovell would be paid a flat fee of $1,200 a week for the first few months, and then $1,350 a

week after the clinic started getting money from its insurance claims.

On December 8, 2009, Dr. Lovell formed a corporation for their clinic, Xtreme Care Rehabilitation Center (Xtreme Care). Dr. Lovell became the sole legal owner of Xtreme Care, although the actual owners were Diaz and Huici. As Huici testified, Dr. Lovell was the owner on paper, but Huici and Diaz were the actual owners of everything.  Huici testified that as the actual owners he and Diaz could have fired Dr. Lovell, but they would have needed to find another doctor with a license.

Dr. Lovell loaned the group $20,000 to help get the clinic started; found a physical location for the proposed clinic; signed the lease; had the utilities in his name; opened a bank account for the clinic, with Jackson with co-signing authority; hired and paid a chiropractor (Dr. Morris) to service the clinic patients; and came by the clinic weekly, largely to pick up his check.  Dr. Lovell had little role in the day to day operations or decisions of the clinic, although he had the legal authority to do virtually everything, including firing Jackson or closing the clinic if he had wanted.  When the insurance companies declined to pay certain claims, Dr. Lovell recommended a lawyer for the needed lawsuit, would be the titular party, and would be the person testifying if necessary.

The clinic started business in February, 2010, and closed in March, 2012.  The clinic submitted false claims to insurance

companies seeking payment for services not performed, or performed on patients who were not really in accidents and did not need the services. When the insurance claims were paid, the money went into the Xtreme Care bank account, and was then used to pay expenses and the co-conspirators. While Dr. Lovell had access to the checks, and wrote some checks to himself, the bank account was controlled by Diaz and Huici as the real owners of the clinic. They essentially used the clinic bank account as their personal piggy bank. Jackson testified that Dr. Lovell never expressed any interest in the amount of money in the bank account.

There came a time when there was a problem with the bank account being closed because the clinic was writing checks for high amounts to too many individual check cashers (persons who would cash the checks for ten percent of the face value). Dr. Lovell told Jackson and the others not to write so many checks to people, but rather write checks to corporations so that the bank would not become suspicious. Jackson followed this instruction. Three corporations were formed and/or utilized by the co-conspirators because, as Huici testified, that was the best way to take money out of Xtreme Care.

Additional facts will be set forth as necessary to resolve the individual objections.

1. **Paragraph 233, Loss Amount:** Defendant objects to the loss amount of $1,087,340.12 utilized in the Presentence Report, and

asserts that the loss amount should be the same amount as he now concedes is the proper restitution amount, $66,088.18.  The million dollar figure is the gross revenue amount received by Xtreme Care from insurance companies for fraudulent claims in 2010 and 2011 (Presentence Report ¶29.)  The $66,088.18 is the amount paid out by the health care providers related to purported treatment of the undercover patients during the course of the health care conspiracy.  Dr. Lovell argues he should not be held accountable for that amount in light of his acquittals on most counts.

The Sentencing Guidelines provide that "loss is the greater of actual loss or intended loss." U.S. Sentencing Guidelines Manual (U.S.S.G.) § 2B1.1. cmt. n.3(A). "Intended loss" is the pecuniary harm that was intended to result from the offense. Id. at cmt. n.3(A)(ii).  The government must support its loss calculation with reliable and specific evidence, and the Court may not speculate about the existence of a fact that would result in a higher sentence.   United States v. Cabrera, 172 F.3d 1287, 1292 (11th Cir. 1999).  Nonetheless, the Sentencing Guidelines do not require a precise determination of loss.  "A sentencing court need only make a reasonable estimate of the loss, given the available information."  United States v. Barrington, 648 F.3d 1178, 1197 (11th Cir. 2011)(quoting United States v. Lee, 427 F.3d 881, 893 (11th Cir. 2005)).  While the loss amount may be the same as the restitution amount, this is not necessarily so.  United States v. Patterson, 595 F.3d 1324, 1326-28 (11th Cir. 2010).

A "district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." United States v. Mateos, 623 F.3d 1350, 1370 (11th Cir. 2010)(quoting United States v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003)). The district court first makes individualized findings concerning the scope of criminal activity undertaken by the defendant, then considers all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity. Mateos, 623 F.3d at 1370 (quoting United States v. McCrimmon, 362 F.3d 725, 731 (11th Cir. 2004)).

The evidence summarized above convinces the Court that Dr. Lovell joined the conspiracy knowing its object was to defraud the insurance companies by submitting false health care claims. Dr. Lovell was an active and knowing participant with a significant role during the formation of the conspiracy, and a continuing role for the length of the conspiracy in the form of advice and the use of his license. It was reasonably foreseeable that the clinic would engage in fraudulent treatment of patients and fraudulent billing of insurance companies, both in connection with false claims from legitimate accidents and false claims from accidents which never actually occurred.

The amount submitted for payment from the insurance companies is the proper measure of loss amount. United States v. Hoffman-Vaile, 568 F.3d 1335, 1343-44 (11th Cir. 2010). Here, the

$1,087,340.12 purports to be the revenue, not the amounts billed to the insurance company. Additionally, the clinic did have "real" patients who had had a real accident and needed actual medical treatment. Jackson estimated that during her tenure at Xtreme Care (until July, 2011) there were almost 200 patients, of which about 20 were legitimate patients. No other information has been provided for the remainder of the conspiracy, but there is no evidence to suggest this ten percent figure changed. Thus, 90% of its patients were part of the fraudulent activities, which results in a loss amount of $978,606.09. Because this offset amount does impact the Sentencing Guidelines calculation, it must be applied. Hoffman-Vaile, 568 F.3d at 1344.

The government has argued that the actual amount billed was more like $1.6 million. The Court will give the government the opportunity to support this allegation at the continued sentencing hearing. Defendant's objection to the loss amount is taken under advisement.

   2. **Paragraph 234, Sophisticated Means**: Defendant objects to the two level increase pursuant to U.S.S.G. § 2B1.1(b)(10) for use of sophisticated means. Defendant argues that the government's theory was that he simply allowed his name and license to be used in exchange for a weekly check, and that the other activities were undertaken by other defendants.

Section 2B1.1(b)(10)(C) of the Sentencing Guidelines imposes a two-level enhancement where "the offense otherwise involved sophisticated means." The commentary to the Sentencing Guidelines defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. § 2B1.1, cmt. n.8(B). In evaluating whether a defendant qualifies for the enhancement, the proper focus is on the offense conduct as a whole, not on each individual step. United States v. Barrington, 648 F.3d 1178, 1199 (11th Cir. 2011)("Each action by a defendant need not be sophisticated in order to support this enhancement."). As is clear from the face of the provision, it is not necessary that a defendant personally perform the acts constituting the sophisticated means, as long as the offense conduct involves such means.

The offense in this case involved the use of sophisticated means within the meaning of the Sentencing Guidelines. The defendants created a corporation in Dr. Lovell's name, and took the normal steps which made it appear that the legal owner of the clinic was Dr. Lovell. In fact, the actual owners were Diaz and Huici. When the clinic ran into trouble with its bank because too many checks were written to individuals, Dr. Lovell advised the co-conspirators to create or utilize corporations and write the checks to the corporations. The co-conspirators utilized these corporations to deposit the proceeds from the insurance companies and withdrawing most of the proceeds without calling undue

attention to their activities. The evidence establishes that Dr. Lovell was well aware of the sophisticated means employed to commit the offense. Defendant's objection is overruled.

    3. **Paragraph 236, Leadership Role**: Defendant objects to the four level increase under U.S.S.G. §3B1.1(a) for his leadership role as an organizer or leader in criminal activity involving five or more participants. Defendant asserts that he was simply an average participant without supervisory authority.

    Section 3B1.1 of the Sentencing Guidelines provides for the enhancement of the base offense level by four levels if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive (§3B1.1(a)), three levels if defendant was a manager or supervisor, but not an organizer or leader, of criminal activity involving five or more participants or is otherwise extensive, (§3B1.1(b)) and two levels if defendant was an organizer, leader, manager, or supervisor in the criminal activity which does not involve five participants or is not otherwise extensive (§3B1.1(c)). A "participant" is a person who is criminally responsible for the offense, even if not convicted. U.S.S.G. § 3B1.1, cmt. n.1. "[W]hen determining the number of participants, the defendant is considered to be one of the five [participants]." United States v. Holland, 22 F.3d 1040, 1045 (11th Cir. 1994). The government must prove the existence of a leadership role by a preponderance of the

evidence. <u>United States v. Yates</u>, 990 F.2d 1179, 1182 (11th Cir. 1993).

The evidence clearly establishes at least five participants in the health care fraud conspiracy. Indeed, there were five participants at the initial meeting outside the restaurant, and other participants as the clinic began operating.

The commentary to § 3B1.1 sets forth factors the Court should consider in determining whether the enhancement applies: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, cmt. n.4. All of these considerations need not be present for an enhancement to apply. <u>United States v. Martinez</u>, 584 F.3d 1022, 1026 (11th Cir. 2009). Evidence showing that the defendant exerted influence or control over just one other individual will be sufficient to support an enhancement under § 3B1.1(c). <u>United States v. Lozano</u>, 490 F.3d 1317, 1323 (11th Cir. 2007); U.S.S.G. § 3B1.1, cmt. n.2. Further, the defendant does not have to be the sole leader of the conspiracy for the enhancement to apply. <u>United States v. Ramirez</u>, 426 F.3d 1344, 1355 (11th Cir. 2005); U.S.S.G. § 3B1.1, cmt. n.4.

The Court finds that the evidence summarized above establishes that Dr. Lovell was an organizer or leader of criminal activity involving five or more participants. Dr. Lovell was involved from almost the inception of the plan, agreed to have the corporation in his name, agreed to use his license to open the clinic, appointed Jackson as office manager, and gave instructions as to banking procedures and the use of other corporations. Defendant's objection is overruled.

4. **Paragraph 237, Abuse of Trust/Special Skill:** Defendant objects to the two level increase for abuse of trust/special skill under U.S.S.G. § 3B1.3(c). The government agrees that there was not an abuse of trust which warrants the increase, and so does the Court. Therefore, the objection is sustained to the extent that the references in paragraph 237 to abuse of trust will be stricken.

The government argues that this enhancement is nonetheless justified because defendant utilized a special skill in a manner that significantly facilitated the commission or concealment of the health care conspiracy. The Court agrees.

Sentencing Guideline § 3B1.3 provides that the court should increase the offense level by two levels "[i]f the defendant . . . used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The commentary defines a "special skill" as one "not possessed by members of the general public and usually requiring substantial

education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." Id. cmt. 4.  "If an 'average person off the street' does not possess the skill, then the skill is considered 'special' for the purposes of applying the enhancement." United States v. De La Cruz Suarez, 601 F.3d 1202, 1219 (11th Cir. 2010)(quoting United States v. Calderon, 127 F.3d 1314, 1339 (11th Cir. 1997)).  A special skill "significantly facilitate[s]" an offense when it confers "an advantage" used "to commit the crime." United States v. Campa, 529 F.3d 980, 1018 (11th Cir. 2008).  A district court's determination that a defendant used a "special skill" in a manner that significantly facilitated the commission of the offense is a finding of fact.  United States v. De La Cruz Suarez, 601 F.3d 1202, 1219 (11th Cir. 2010).

It is undisputed that defendant is a chiropractor licensed in the State of Florida.  It is also undisputed that under Florida law a clinic such as Xtreme Care would have had to obtain a license from the State of Florida if it had not represented itself as being solely owned by Dr. Lowell.  Had the true state of the ownership been disclosed, Xtreme Care could not have operated.  Dr. Lovell's use of his license was essential to the operation of the clinic, and hence to its fraudulent claims.  A licensed chiropractor who allows his license to be used in such a fashion is utilizing a special skill not possessed by the average person, including all of

the co-conspirators in this case. Defendant's objection is overruled.

5. **Paragraph 308, Restitution**: At the August 5, 2013, defendant withdrew his objection to restitution in the amount of $66,088.18.

Accordingly, it is now

**ORDERED**:

1. Defendant's objection to Paragraph 233 is **TAKEN UNDER ADVISEMENT**.

2. Defendant's objection to Paragraph 234 is **OVERRULED**.

3. Defendant's objection to Paragraph 236 is **OVERRULED**.

4. Defendant's objection to Paragraph 237 is **SUSTAINED** as to language relating to abuse of trust, which is stricken, and is **OVERRULED** as to the enhancement for special skill.

5. Defendant's objection to Paragraph 308 was **WITHDRAWN**.

6. Pursuant to Fed. R. Crim. P. 32(i)(3)(C), the U.S. Probation Office is directed to append a copy of these determinations to any copy of the Presentence Report made available to the Bureau of Prisons.

**DONE AND ORDERED** at Fort Myers, Florida, this ___12th___ day of August, 2013.

                                             _John E. Steele_
                                             JOHN E. STEELE
                                             United States District Judge

Copies:
Counsel of Record
U.S. Probation