UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:12-CR-26-FtM-29DNF

VOLUME ONE OF TWO

====================================================

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                 Fort Myers, Florida

vs.                             August 5, 2013

STEPHEN M. LOVELL,               3:49 p.m.

        Defendant.

====================================================

TRANSCRIPT OF SENTENCING, DAY ONE

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR PLAINTIFF:    Office of the United States Attorney
                    2110 First Street
                    Suite 3-137
                    Fort Myers, FL  33901
                    (239) 461-2200
                    BY:  JESUS M. CASAS, ESQ.
                          Assistant United States Attorney

FOR DEFENDANT:    Aiken, O'Halloran & Associates
                    2575 Cleveland Avenue
                    Fort Myers, FL  33901
                    (239) 334-8890
                    BY:  PETER D. AIKEN, ESQ.

ALSO PRESENT      JODI PETERSEN, Probation Officer

REPORTED BY:      JEFFREY G. THOMAS, RPR-CP, CRR
                    Official Federal Court Reporter
                    United States Courthouse
                    2110 First Street, Suite 2-194
                    Fort Myers, FL  33901
                    (239) 461-2033

I N D E X

| August 5, 2013 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 1 | 3 |
| Motion for Access by the Defendant | 1 | 3 |
| Objections to PSR by Mr. Aiken | 1 | 8 |
| Response by Mr. Casas | 1 | 11 |
| Further Argument by Mr. Aiken | 1 | 15 |
| Further Argument by Mr. Casas | 1 | 21 |
| Further Argument by Mr. Aiken | 1 | 26 |
| Further Argument by Mr. Casas | 1 | 28 |
| Further Argument by Mr. Aiken | 1 | 29 |
| Further Argument by Mr. Casas | 1 | 32 |
| Further Argument by Mr. Aiken | 1 | 36 |
| Further Argument by Mr. Casas | 1 | 38 |
| Further Argument by Mr. Aiken | 1 | 39 |
| Further Argument by Mr. Casas | 1 | 40 |
| Further Argument by Mr. Aiken | 1 | 43 |
| Discussion Re Scheduling | 1 | 43 |
| Discussion Re Transcripts | 1 | 45 |
| Discussion Re Scheduling | 1 | 47 |
| Court Recessed for the Day | 1 | 49 |

* * *

1    THEREUPON, the above-entitled case having been called to

2    order, the following proceedings were held herein, to-wit:

3                              - - -

4         THE COURT:  All right.  This is the case of the

5    United States versus Stephen M. Lovell.  It's Case 2:12

6    Criminal 26.  Representing the United States is Assistant

7    United States Attorney Jesus Casas.  Representing the

8    defendant, who is present in court, is Attorney Peter Aiken.

9         We are scheduled for sentencing.  Are both sides

10   ready?

11             MR. CASAS:  Yes, Your Honor.

12             MR. AIKEN:  I am, Your Honor, but I think the

13   defendant wishes to address the Court, Your Honor.

14             THE COURT:  All right.  You may.

15             THE DEFENDANT:  Your Honor, basically what I have to

16   say, could we possibly do it in camera?

17             THE COURT:  What do you mean by "in camera"?

18             THE DEFENDANT:  In other words, without -- with only

19   my attorney and . . . .

20             THE COURT:  Let me do this.  Let me start at sidebar

21   with you and your attorney and see where this is going, since I

22   don't really have a clue, and then we'll take it from there.

23                          AT SIDEBAR

24             THE COURT:  This is the microphone that goes to the

25   court reporter, so we need to all be talking into the

 1    microphone.

 2           For the record, we're at sidebar, with the defendant

 3    and his counsel, not any representative of the government, but

 4    we're otherwise in open court.  And I'll treat that as a sealed

 5    record unless I determine otherwise.  I need a clue.

 6           THE DEFENDANT:  Your Honor, the e-mails going back to

 7    me first from Mr. Aiken, where he states that he will not file

 8    any post-conviction motions for me, he was going to stay on

 9    through sentencing but he will not file any motions.  I have

10    repeatedly asked him to file the specific Brady for additional

11    discovery based on new evidence; and he's refused on three

12    different e-mails.  And I have them with me.

13           THE COURT:  Okay.

14           Mr. Aiken?

15           MR. AIKEN:  I don't have a legal basis to file an

16    allegation for a Brady violation.  I'm familiar with the facts

17    of the case.  I have reviewed -- I understand that the Doctor's

18    objections relate to Iliana Rodriguez; we addressed this

19    several weeks ago.  And he didn't want me on the case.  I don't

20    see any remote area where there would be a Brady violation.

21           They did an undercover investigation on Iliana

22    Rodriguez.  They went in, not interviewing her, went in, in an

23    undercover capacity, talked to her outside of the clinic, she

24    basically said I've got a doctor for you.  It's Dr. Lovell.

25    No.  I just want to respond.

1          I have discussed this with the government, I have

2     reviewed my cross-examination of Agent Tucker.  Agent Tucker

3     did not lie on the stand at all, and I don't have a good faith

4     basis to file a Brady violation.  I have not refused to file

5     any motions, I've filed very, very extensive objections.  But I

6     don't have a good faith basis to file that motion.

7          THE COURT:  Has anything changed from our discussion

8     of this topic a week or two weeks ago?  I forget exactly when

9     that was.  Other than the e-mails?

10          THE DEFENDANT:  Yes.

11          MR. AIKEN:  I have now had a chance to review the

12     cross-examination that I did on Agent Tucker, and I would have

13     done it exactly the same way.  I see absolutely no violation.

14     There is no indication that Agent Tucker ever lied.

15          THE DEFENDANT:  On the cross-examination, it was a

16     good cross.  But --

17          THE COURT:  Say again?

18          THE DEFENDANT:  It was a good cross.  However, Agent

19     Tucker admitted that, to do an open, fair, thorough

20     investigation, the accountant should have been investigated,

21     and he -- he said she should have.

22          We don't have access to the undercover operation into

23     Royal Diagnostics, which is the x-ray facility that they found

24     out Iliana Rodriguez owned.  She's also the owner of the

25     accounting firm.  For multiple clinics and for a lot of the

1  other people involved, Ernesto Diaz and Francisco Huici, as

2  well as a lot of Dr. Hall's clinics.  So without having the

3  privilege of knowing what was found out, we just don't know.

4  And I don't believe the jury was fully informed to make a just

5  decision.

6          And as far as Agent Tucker lying or anything, I'm not

7  saying he's lying; but it's my understanding that impeachment

8  of a witness goes to anything, any information that says

9  otherwise even if he doesn't know.  But yet Agent Tucker was on

10  the case for well over a year, and he's part of the prosecution

11  team.  He had to know.

12          MR. AIKEN:  They are not denying that there was an

13  undercover investigation of Iliana Rodriguez, and if you read

14  the cross-examination in its entirety, and I have no problem

15  with the Court reading this while we are not here, I'm

16  basically trying to shift the blame on her, which is good

17  defense strategy.  It ultimately didn't work because she is

18  only a tiny, tiny fraction of the case.  The government's

19  position is that she probably was guilty, and then basically

20  said her investigation will be on another day.

21          But I mean I would never in a million years call her

22  as a witness and I wouldn't change a thing about the cross.

23          THE DEFENDANT:  I would have wanted you to call her

24  because --

25          MR. AIKEN:  I would never have called her.  Ever.

1    She would have buried you.

2              THE COURT:  What is it you want me to do?

3              THE DEFENDANT:  I would like to have access to all of

4    those -- like I told Mr. Aiken, all the debriefing reports, the

5    police reports, and the audio tapes, or anything involving her.

6    There were three different times:  August 22nd; November, I

7    think, 11th -- or 22nd; and then again November 9th.  Two times

8    at the x-ray facility and once at her office.  And there's more

9    involvement there.  If a jury had known that she was involved

10   with that x-ray facility, which the undercovers said were

11   paying patients, she's an instrumental person in this whole

12   organization.

13             MR. AIKEN:  That doesn't change any of the facts with

14   respect to you.

15             THE COURT:  The motion's denied.

16                       IN OPEN COURT

17             THE COURT:  The Court will direct that the

18   conversation between myself and the defendant and defense

19   counsel at sidebar remain considered in camera and sealed.  It

20   relates to a matter that we had actually discussed several

21   weeks ago, and perhaps has some additional information, but

22   nonetheless, relates to the relationship between defendant and

23   his attorney.  And so at this point I see no reason to make

24   that part of the public record.

25             All right.  Mr. Aiken, you all set?

 1          MR. AIKEN:  Yes, we are set, Your Honor.

 2          THE COURT:  If you will come up the sidebar -- not

 3  sidebar, the podium, rather, with your client.

 4          Before I proceed with the colloquy, I did receive

 5  some letters, and I have a note that they were distributed to

 6  the attorneys and that I have the original.  Have you all seen

 7  the same letters I have?

 8          MR. AIKEN:  I have, Your Honor.  Those were provided.

 9  We provided those to the Court.

10          THE COURT:  Okay.  I didn't . . . .

11          MR. AIKEN:  I think they're letters from the family

12  and friends.

13          THE COURT:  Exactly.

14          Mr. Casas, I assume you've seen those or not?

15          MR. CASAS:  Your Honor, I was provided a copy by

16  Mr. Aiken and I received a separate copy apparently by way of

17  the clerk's office by way of Mrs. Lovell.

18          THE COURT:  All right, then, you probably received a

19  copy of these.

20          MR. CASAS:  I compared them and they seem to be one

21  and the same thing.

22          THE COURT:  All right.  Dr. Lovell, on February

23  the 28th of 2013, a jury found you guilty of Count 1 of an

24  indictment charging you with conspiracy to commit health care

25  fraud in violation of Title 18, United States Code,

1    Section 1349 and 1347.  The Court previously adjudicated you

2    guilty of that offense.  We have now reached the stage of the

3    proceedings where it's my obligation to decide what sentence

4    should actually be imposed.

5                Have you read the presentence report and the addendum

6    to that report?

7                THE DEFENDANT:  Yes, Your Honor.

8                THE COURT:  And have you discussed the contents of

9    each of those documents with your attorney?

10               THE DEFENDANT:  Yes, Your Honor.

11               THE COURT:  Mr. Aiken, have you likewise read the

12   presentence report and the addendum, and discussed the contents

13   of each with your client?

14               MR. AIKEN:  Yes, Your Honor.

15               THE COURT:  And Mr. Casas, have you also had the

16   opportunity to review the presentence report as well as the

17   addendum?

18               MR. CASAS:  I have, Your Honor.  I have no objection

19   to the factual basis or the application of the guidelines

20   contained therein.

21               THE COURT:  All right.

22               Mr. Aiken, any unresolved factual objections?

23               MR. AIKEN:  Yes, Your Honor.  With respect to the

24   Paragraph 233, which is the loss amount, the probation officer

25   recommended the loss amount in the amount of $1,087,340.12.

1    Most respectfully, we'd respectfully submit that the loss

2    amount should be the amount in the restitution.  It may be

3    somewhat difficult for me to go into it in great detail in that

4    this Court was not the presiding judge; but basically there was

5    a health care clinic, they sent undercover officers in, and

6    they -- those individual charges on those undercover officers

7    were obviously clearly fraudulent and did result in loss.

8            But at the same time there were another 290 patients,

9    approximately, that did receive treatment.  There's no

10   indication that they were phoney treatments, there is no

11   indication that there were phoney losses; and even Karen

12   Jackson, who was one of the participants there in the

13   conspiracy, but also a patient, even testified that she did, in

14   fact, have legitimate injuries and did in fact receive

15   legitimate treatment.  So we would have to speculate as to

16   which of the -- what amount that loss would be.  And it makes

17   an enormous difference, because it is a six-level difference if

18   we go with the million, versus the 60,000, which is the amounts

19   as computed on the actual and fraudulent charges.

20           So my objection would be that there is no evidence

21   that the other charges were or did result in any type of loss.

22           THE COURT:  My memory is the dollar amount that was

23   the restitution figure was 66,000?

24           MR. AIKEN:  That is correct.  That's the amount that

25   was the billings on the charges that were attributable to the

1    undercover officers.  And I might also state that I am

2    withdrawing my objection as to the restitution amount because I

3    think that is, in fact, correct.  I made that objection also.

4    But I'm withdrawing that objection.  I think the 66,000 is the

5    correct amount.

6              I understand the government's theory.  The

7    government's theory is, well, everything is a loss, because,

8    you know, they wouldn't have/couldn't have run the clinic

9    without it, but I don't think they can honestly say that there

10   wasn't any legitimate treatment there and there weren't any

11   legitimate patients.  Every patient there wasn't a fraud.

12             THE COURT:  All right.  Well, let me see what they

13   say.

14             Mr. Casas?

15             MR. CASAS:  Mr. Aiken is mistaken to the extent that

16   there was testimony during the trial by Miss Karen Jackson.

17   Her transcript is Document 375 in the Court docket.  I do have

18   a copy of that for the Court if the Court wishes to review

19   that.  At Page 56 of that transcript, Miss Jackson states that:

20   Most of the patients while she was there did not need

21   treatment.  She estimated that 20 of the 200 patients were real

22   patients.  At Page 56 and 57 of the transcripts, she indicated

23   all of the patients were paid except one.

24             If you consider the testimony of Ernesto Diaz as well

25   as Francisco Huici, who indicated that each of the patients

1    brought in approximately $8,000 in revenue, of which they had

2    expenses after the fact, if you multiply that by 180, it would

3    certainly be in excess approximately of the million dollars

4    that is involved in this particular case.

5            Nevertheless, the amount that we are alleging is the

6    amount that this clinic, which was unlawfully operating,

7    generated during the timeframe of its existence.  We don't

8    believe that the license of Dr. Lovell was the lawful basis for

9    this clinic to operate.  This clinic was not truly owned by

10   Dr. Lovell; it was truly owned by Ernesto Diaz and Francisco

11   Huici.  And under Florida law all the charges that the

12   individuals submitted on behalf of the clinic, purportedly

13   owned by the defendant, were not compensable and therefore

14   fraudulent.  And that is our basis for seeking that amount, not

15   only as it was in the money judgment, but as it relates to the

16   monetary loss.

17           MR. AIKEN:  If, in fact, there were 20 --

18           THE COURT:  Hang on a second.

19           MR. AIKEN:  My apologies, Your Honor.

20           THE COURT:  I'm not done with him.

21           Mr. Casas, then do I understand you basically have a

22   two-pronged response; one is that because the clinic was

23   operating without a license based upon Dr. Lovell's license,

24   everything was legally a loss because the clinic would have

25   otherwise not been entitled to earn anything?

1          MR. CASAS:  That is correct.  That is one prong of

2     it.

3          THE COURT:  And then the second prong is even if the

4     Court were to reject that, there really weren't that many real

5     patients, and that the, if I can, phoney patients, the loss

6     that results from them is still over a million dollars?

7          MR. CASAS:  That is correct, Your Honor.

8          THE COURT:  And you get that dollar figure by

9     extrapolating the -- I think you had an 8,000-dollar average

10    times 180 patients?

11         MR. CASAS:  That's based on the testimony of

12    Miss Jackson coupled with the testimony of Ernesto Diaz and

13    Francisco Huici as to what each patient brought in, in terms of

14    revenue, to the clinic.

15         THE COURT:  Are there -- I assume there are documents

16    somewhere that would account for the amount of money that went

17    through that clinic?

18         MR. CASAS:  There were certainly bank records to that

19    extent, which we certainly had a summary chart that was

20    admitted in evidence.  Of the financial activity of Xtreme

21    Care, for 2011, that was at Government's Exhibit Number 16.

22    For 2011, the insurance proceeds were $961,201.92.  The

23    attorney proceeds, which were the result of litigation related

24    to claims that were made by Xtreme Care Rehabilitation Center

25    for patients, was $23,932.

1       There were some other related revenue items that were

2    listed.  There was a returned item for $11,350.  Cash of

3    $7,070, and some other smaller dollar amounts.  That total

4    revenue -- and this is only for 2011 -- was $1,004,241.

5    Recognizing Xtreme Care operated from February of 2010 to March

6    of 2012, so you have most of 2010, and a small part of 2012, to

7    take into consideration in making that finding as well.  The

8    focus of the evidence that was introduced at trial was on 2011,

9    during which the undercover activity took place.

10       There was certainly some other financial information

11   that was introduced relative to 2010, and that was Exhibit 17,

12   which was a financial analysis of HDCA Services, Inc., which

13   was one of the shell corporations from which money -- or

14   through which money was funneled from Xtreme Care

15   Rehabilitation Center to Ernesto Diaz and Francisco Huici.  And

16   for that timeframe that that particular shell corporation was

17   in existence, which would -- was December 2009, to November of

18   2010, it had a total revenue of $141,412.52; $126,138.20 of

19   which was payments from Xtreme Care, the clinic.  That was its

20   primary source of cash revenue.

21       So if you were just to consider the 126,000

22   associated with Government's Exhibit 17, which we're not saying

23   is the only basis of revenue for Xtreme Care, but that was

24   money that was taken out of Xtreme Care, and add it to the

25   961,000 in 2011 directly attributable to Xtreme Care by way of

1    insurance proceeds, it's well in excess of a million dollars.

2         We still stand by our $1.6 million figure in terms of

3    the gross revenue of this entity during the course of its

4    existence, Your Honor.

5         THE COURT:  And the guideline range is what; is it a

6    million?

7         MR. AIKEN:  The million is a split.

8         MR. CASAS:  It's a million dollars, Your Honor.

9         THE COURT:  So whatever it is above that really

10   doesn't matter, for guideline purposes anyhow.

11        MR. CASAS:  That is correct, Your Honor.

12        THE COURT:  A million and the two and a half is the

13   same.

14        MR. CASAS:  Yes, sir.  As I indicated in the

15   memorandum, the next threshold is two and a half million, and

16   we are not even close to that.

17        THE COURT:  Okay.  All right.

18        Mr. Aiken.

19        MR. AIKEN:  To the extent that the cutoff point is a

20   million dollars, it does make a difference, in other words, if

21   you take the 961.  I would have to presume that if the money

22   from lawyers came from litigation, that somebody had made a

23   determination somewhere along the way that those are legitimate

24   claims.  So I don't think the Court should count that.  In

25   other words, if you have to count anything, I think the

1   government's position is the 961 is insurance proceeds.  As I

2   understand their argument, they're saying all that then should

3   be treated as loss.

4          Regardless how we do it, you are still left

5   speculating to some degree, because even Karen Jackson, you

6   know, if you look at her testimony, she says, well, there were

7   20 or more patients that were legitimate; 20 or more patients

8   times $8,000 is 160 grand right there.  So I think the amount

9   has to be under the million.  The loss is obviously something,

10  but I don't know that we can put an exact figure on it.  And to

11  the extent that the million dollars is the cutting point, it

12  does make a difference.

13         I would ask the Court not to speculate as to loss.

14         THE COURT:  Well, under the guidelines, the loss

15  amount is calculated at either the actual loss or the intended

16  loss.  Actual loss, in turn, is defined as the reasonably

17  foreseeable pecuniary loss resulting from the offense.

18  Pecuniary loss just is -- essentially means money, or monetary

19  value, measured in money.

20         What's wrong with the government's theory that

21  everything is loss in light of the license situation?

22         MR. AIKEN:  I understand that argument, Your Honor.

23  I'm looking at a situation where the jury rejected it.

24  Particularly as it relates to the Doctor.  Because he was

25  included in 19 other counts.  And they obviously concluded that

1  he wasn't -- that a lot of the loss wasn't reasonably

2  foreseeable by him.  And this sort of dovetails into my other

3  argument that he wasn't the leader, organizer of anything.

4       As to the reasonable foreseeability of it, I don't

5  think that he could reasonably foresee the pain -- and I think

6  the government will candidly admit he had nothing to do with

7  paying any patients, didn't know any patients were being paid,

8  and his involvement in this case was to the extent of $1,200 a

9  week.  So I would hate to see him held accountable for what's

10  reasonably foreseeable because a lot of what these other people

11  did he had absolutely no knowledge of.  It's a tough call

12  because how do we determine the number.

13       THE COURT:  All right.  What's next?  I'm going to

14  hear all the arguments, because I think they may dovetail with

15  one another.

16       MR. AIKEN:  It does, Your Honor.  The next one is

17  Paragraph 236, whether or not he should pick up the four-point

18  bump for being the organizer, leader, and that is absolutely

19  contrary to the position taken by the government at trial.  If

20  I would go back and look at Mr. Casas' opening statement, they

21  said he didn't pick the name, he didn't hire the people, he

22  didn't decide the salaries, he didn't hire the accountant, he

23  didn't do the taxes, and he basically exercised no supervision.

24       Their position was, at trial, and opening, and

25  closing, and throughout the trial, that he basically, all he

1    did was let them use his license.  In other words, he wasn't

2    even there.  He would come by once a week for 20 minutes, walk

3    in and pick up a check.

4            I think Karen Jackson's testimony was that Ernesto

5    and Francisco needed a doctor, and that I knew a doctor.  She

6    was actually working for Dr. Lovell.

7            Ernesto's testimony is I created the name, I saw it

8    on a truck -- and I'm overly simplifying here -- but

9    Francisco's testimony was Karen proposed it, I put up the

10   money.  At trial -- and I think this is why I thought Judge

11   Magnuson could better appreciate particularly this issue at

12   trial.  Their position was that he was basically a nonentity

13   there, he didn't do anything.

14           Dr. Morris was the doctor that he hired, that

15   actually saw the patients, and they said all he did was come

16   by.  The only references they make to him in the bank account

17   is there was a brief period for about two weeks where Karen

18   Jackson quit before the other lady came in, and he pre-signed a

19   bunch of checks.  But other than that, he had nothing to do

20   with the day-to-day organization.  He didn't get the equipment.

21   I mean, they went into great detail.  They had executed a

22   search warrant at Francisco's house, yeah, we went in there,

23   Francisco ordered all the equipment, it was done with Francisco

24   and Karen.

25           And this dovetails into another thing, but Dr. Hall,

1   who this Court recently sentenced to 18 months, was in an

2   identical position.  Dr. Hall and Dr. Lovell, for years, had

3   been partners in some of the clinics.  They had been using and

4   sharing the same chiropractic doctors working for them, and

5   they were almost 100 percent identical in terms of relative

6   culpability.

7           So I don't see him even remotely as the organizer or

8   leader.  He was the name that they used.  But he wasn't running

9   it, he had nothing to do -- and all of the witnesses testified

10  that he didn't see a single one of the patients, that he had

11  nothing to do with recruiting accident victims, he had nothing

12  to do with staging, he had nothing to do with the books.  In

13  terms of the bookkeeping, he had nothing to do with that.

14          When you go in and look at the exhibits, if you look

15  at the checkbook, they didn't even keep a running balance in

16  the checkbook where he would know how much money was in the

17  account.  On the occasions when he would come in once a week,

18  he would come in and he'd write a check for 1200 bucks.  And I

19  agree it was sandwiched in there with all the other checks, but

20  there was no way he could even know how much was in the bank

21  account because that was all exclusively in the control of

22  Karen and Ernesto and Francisco.  So I -- and this goes to

23  relative culpability also, so I'm sort of combining the

24  arguments.  He's no different than Dr. Hall.  The only

25  difference is Dr. Hall pled, and cooperated, and testified.

 1   But in terms of his relative role, it's identical.

 2          The other thing that I look at in determining who is

 3   the leader, organizer, supervisor, manager, and I've been doing

 4   fraud cases for 30 years is, follow the money.  If you want to

 5   find out who's the boss, follow the money.  And that was the

 6   argument that the government basically used at trial, cause if

 7   you follow the money, out of the -- hypothetically, if a

 8   million dollars comes in, in one year, the Doctor gets $60,000,

 9   out of which he has to pay Morris, and everything else goes to

10   Ernesto and Francisco.  So you can't overcome -- if you're

11   looking for organizer, leader, supervisor, manager, owner, in

12   other words, they argued they're the owners.  Not the Doctor.

13          And so the position that they're taking in their

14   sentencing is oh, no, no, he's the organizer, leader,

15   supervisor, manager; and that's exactly the opposite of the

16   position they took at trial.  The position they took at trial

17   was he's a nobody, other than letting them use the license.  He

18   had no control.  As a matter of fact, if you look at the

19   testimony, he had nothing to do with hiring, he had nothing to

20   do with setting salaries, he had nothing to do with firing.

21   All of that, 100 percent of that, was Francisco, Ernesto, and

22   Karen.  They can't have it both ways.  I mean, he's not the

23   leader.  They used his license.  That was the argument they

24   used at trial, that was the argument used in opening and

25   closing, he's a doctor, they needed a license, they paid him

1    $1,200 a week for the license.

2            So I would object to the four level increase.

3            THE COURT:  All right.  I'm looking at the charge, it

4    looks like Dr. Hall had a loss amount attributable to him in an

5    amount just over $690,000.  And then you're correct as to the

6    ultimate sentence I imposed back in May of this year.  All

7    right.

8            Mr. Casas?

9            MR. CASAS:  I'm sorry, Your Honor?

10           THE COURT:  As to the arguments that relate to the

11   objection to the role enhancement?

12           MR. CASAS:  Your Honor, let me start, first of all,

13   with the argument that my position is inconsistent with what it

14   was at trial.  To the contrary, it is still consistent with the

15   position we maintained at trial.  Certainly, at trial, we

16   establish that Dr. Lovell, along with Karen Jackson, Ernesto

17   Diaz, Francisco Huici, Jeanine Huici, came together for the

18   purpose of creating this clinic.  They could not do it without

19   the defendant because they are not licensed health care

20   practitioners.  He is the cornerstone to the creation of Xtreme

21   Care Rehabilitation Center.  Once he agrees to lend his license

22   to their purpose, they start obtaining the things that are

23   necessary to carry out the business.

24           At trial, there was testimony that the defendant

25   loaned them $20,000.  For what purpose was not exactly clear;

1  there was some reference perhaps to having to pay patients.

2  Francisco Huici put up approximately $40,000.  They purchased

3  the equipment.  They did the paperwork.  To take the position

4  that the defendant was not part of that organizational episode,

5  again, is contrary to the evidence at trial.  That was

6  testified to by Karen Jackson, Ernesto Diaz, Francisco Huici

7  and Jeanine Huici.  That the defendant was there at the

8  inception, the creation, and effectively the conspiracy to

9  commit health care fraud.

10        Now, Mr. Aiken says I argued things in opening and

11  whatnot.  Well, if you went back and you reviewed the

12  transcripts, and the cross-examination of Karen Jackson,

13  Ernesto Diaz, Francisco Huici, Mr. Aiken took the position that

14  the defendant was, in fact, in control there; that he could

15  make the hiring decisions, that he had that control over the

16  clinic that these individuals didn't have.  The reason why was

17  the statute in question, the Florida statute, which talks about

18  supervising the activity of the individuals, and certainly

19  Mr. Aiken wanted to show that the defendant was the one who was

20  capable of making those decisions.  Our position was these true

21  owners were the ones who made the decisions as it related to

22  who worked there, how much they got paid, how much money they

23  could take out of the business.

24        The reality was this wasn't the defendant's business.

25  It was Ernesto Diaz and Francisco Huici's.  That's why he

1    didn't care what was in the bank account as was established in

2    the testimony.  All he cared about was the weekly amount, 1200,

3    1350, as it varied.  That's what his agreement was with these

4    individuals.

5            However, in order for this conspiracy to work, and

6    for to it exist, and for that business to continue, at least in

7    the way that it was created, the defendant had to continue to

8    agree to be the purported whole owner of that clinic.  If he

9    steps away from that agreement, they have to find another

10   doctor.  And that was also the testimony that was presented at

11   trial by way of Francisco Huici and Jeanine Huici.  If they

12   ever decided to break that relationship with the defendant,

13   they certainly could have found another doctor, albeit one who

14   was willing to violate the law, but they would have to have

15   done that.  They didn't have to do that because the agreement

16   worked.  They all agreed to do this and it worked until the

17   end.

18           The bottom line is, the defendant wasn't there on a

19   day-to-day basis to manage the activity of these individuals;

20   there were other individuals within the conspiracy to do that.

21   But he was an organizer of the criminal activity.  He was the

22   one, per the testimony of Karen Jackson, Ernesto Diaz, in

23   particular, directing them not to write checks to individuals,

24   but to write the checks to the corporations.

25           Again, if the Court needs citations to that, I have

1   those as well.  I may have cited it in my memorandum.  If I

2   didn't, for Karen Jackson, document 375, it's at Page 40.  She

3   indicated that the defendant told her not to write so many

4   checks to people in high amounts, because he was upset that the

5   bank account had been closed.  In fact, all the bank accounts

6   associated with the defendant had been closed due to the

7   suspicious activity associated with it, and namely that was

8   a bank account associated with the clinic writing checks to

9   individuals.  Which, quite frankly, doesn't make a lot of

10  sense, and certainly that was the evidence that was presented.

11  It was the defendant's instructions to them, write them to

12  corporations.  They created three -- ultimately, actually four

13  shell corporations that were associated with that banking

14  activity in the primary way that the money was taken out of

15  Xtreme Care and used to promote and ultimately fill the pockets

16  of the conspirators.

17          THE COURT:  How is Dr. Lovell different than

18  Dr. Hall, who did not get any role enhancement?

19          MR. CASAS:  I don't recall if Dr. Hall got a role

20  enhancement or not.  I don't have the presentence report in

21  front of me.  Is the Court certain about that?

22          THE COURT:  Well, I'm certain I'm given a chart by

23  probation.  I don't have the presentence report that says there

24  was no role enhancement.  I haven't checked my notes, which I

25  can do.  But --

1           MR. CASAS:  I don't recall.

2           THE COURT:  -- I'm led to believe there was no role

3    enhancement.  Let me put it that way.

4           MR. CASAS:  Again, I think --

5           THE COURT:  If it matters, of course, I can check my

6    notes.  That's easy enough to . . . .

7           MR. CASAS:  Yeah, I don't have the presentence

8    report.  I think they are in one and the same position as it

9    related to this type of fraudulent scheme.  They are both

10   licensed health care practitioners, they are both individuals

11   who, for payments on a weekly basis, they basically allow their

12   license to be used by individuals who otherwise would not be

13   qualified, or otherwise past background checks related to these

14   types of clinics.  Those individuals then take that clinic and

15   turn it into a fraudulent billing machine.

16           The money laundering was slightly different in that

17   Dr. Hall didn't instruct anyone at CNA about money laundering,

18   to our knowledge.  Dr. Hall basically was just that figurehead,

19   the same as the defendant.  The money laundering at CNA, quite

20   frankly, was done in a different way, but didn't involve shell

21   corporations or anything.  The primary defendant in that case

22   just wrote the checks to himself.  He wrote some checks to a

23   trucking company.  But that was to a lesser extent.

24           Dr. Hall's role, I would say, is not substantially

25   different from the defendant's.  His conduct after the

1    investigation is remarkably different.  And that makes a big

2    difference, in my mind, in fashioning a sentence.

3              THE COURT:  I understand that.  But in terms of role.

4              Brenda?  Let me see if I can get my notes.

5              (The Court confers with the courtroom deputy.)

6              THE COURT:  All right.

7              Mr. Aiken, anything further as to that?

8              MR. AIKEN:  Yes, Your Honor.  And it ultimately goes

9    to what I will be stating in terms of allocution and what would

10   be a fair sentence.  The other one is, I think they also

11   recommended a two-level enhancement for abuse of trust.  And I

12   don't think that was applied to Dr. Hall either.  Basically,

13   their position is that, if you have a license, and then you do

14   something wrong, you have somehow abused your trust with the

15   state who issued you the license.  I think that abuse of trust

16   would be more that if you've done something to a patient or

17   done something to a client.  I don't think that just because

18   you have a license you are in a position with a trust -- in a

19   position of abuse of trust with the agency that licenses you.

20             So I would ask the Court, in terms of treating

21   defendants similarly situated to take a look at the position

22   that was taken with respect to Dr. Hall, because Dr. Hall and

23   Dr. Lovell were friends, they were in the same clinics, they

24   had partnered in the same clinics, they shared the same

25   Dr. Morris, they shared some of the same other employees, and

1    he is absolutely 100 percent identical to Dr. Hall.  The

2    difference is he doesn't get the benefit of a downward variance

3    or downward departure for testifying because obviously he

4    didn't, he went to trial, and he doesn't get the three-level

5    acceptance of responsibility because he went to trial.  But in

6    all other respects, he's identical.

7            THE COURT:  Of course, if I made a mistake with

8    regard to Dr. Hall, I shouldn't be doomed to repeat that

9    mistake with every -- thereafter.

10           MR. AIKEN:  I think your decision with respect to

11   Dr. Hall was absolutely correct, Judge.

12           THE COURT:  Well --

13           MR. AIKEN:  I mean, I don't know what was

14   recommended.  I don't have the benefit of seeing Dr. Hall's

15   PSI, so I don't have the benefit of knowing what was

16   recommended.  But I don't think it's fair just because the

17   Doctor chose to go to trial, and came extremely close to

18   winning, I don't think it would be fair to load him up with all

19   of the enhancements that the other person -- I mean, you can't

20   get any more similarly situated than Dr. Hall.  That would just

21   be I think manifestly unjust to load him up with the

22   enhancements just because he went to trial.  I am not

23   suggesting that you're doing that.  But I think sometimes that

24   happens in the PSI.

25           The other one I object to is sophisticated --

1          THE COURT:  I didn't take it personal.  Don't worry

2     about that.

3          MR. AIKEN:  Yes, sir.  The other one I object to --

4          THE COURT:  Let me hear from the government as to

5     that argument.

6          MR. CASAS:  I'm sorry, Your Honor?

7          THE COURT:  Let me hear from the government as to the

8     abuse of trust issue.

9          MR. CASAS:  Your Honor, we're not taking the position

10    that the defendant abused a position of public or private

11    trust.  Rather, I'm taking the position that he used a special

12    skill.  And, in that regard, the special skill was his

13    licensing as a health care practitioner; which, quite frankly,

14    without that, this crime could not have been committed.  And

15    that testimony is uncontroverted as it was presented at trial.

16    It was his license that allowed these individuals to open that

17    clinic to begin with.

18         THE COURT:  So I don't need to worry about the abuse

19    of trust cases; it's the special skill, akin I suppose to a

20    pilot's license in a drug case?

21         MR. CASAS:  A special skill is defined as a skill not

22    possessed by members of the general public, and usually

23    requiring substantial education, training, or licensing, as

24    defined, Your Honor.  That's what I would ask the Court to rely

25    on.  I don't believe he was in a fiduciary relationship that

1    would otherwise invoke that trust that you might otherwise look

2    for.

3                    THE COURT:  All right.

4                    Mr. Aiken, does that change your view?

5                    MR. AIKEN:  No, Your Honor.  I mean, he basically

6    wasn't doing and wasn't using a skill.  In other words, he had

7    a license.  He didn't do anything other than let them use it.

8    But he wasn't using any skill to do that.

9                    THE COURT:  I presume he would tell me it took skill

10   to get the license.

11                   MR. AIKEN:  I would agree.  But I don't think that

12   he's using it.  In other words, it -- I don't see how he is

13   using that skill.  In other words, they needed a license.  I

14   mean, if you look at -- and I tried the case, but if you go

15   back and look at the testimony, Francisco was even meeting with

16   the undercover agents saying, hey, we'll open clinics other

17   places, I'll get another doctor.  In other words, basically all

18   they needed was a piece of paper.

19                   And that brings me to the other argument on

20   sophisticated means, also, Your Honor, which is Paragraph 234.

21                   THE COURT:  All right.  Let's go there.

22                   MR. AIKEN:  On sophisticated means, Your Honor, I

23   understand the government's argument -- but he was acquitted.

24   I understand the government's argument, I think.  That in terms

25   of sophisticated means he was telling them, here, write the

1  checks here, do this, do that, but that also goes to the

2  credibility of the witnesses.  And I know Judge Magnuson heard

3  the trial, and he was acquitted of everything that had to do

4  with a conspiracy to commit money laundering.  He was acquitted

5  with -- of all of the health care fraud he was acquitted of 19

6  out of 20 counts.

7        What they found him guilty of, and the only way I

8  think they can logically reach that conclusion is his role was

9  solely let him do the license.

10        So I don't think he used any sophisticated means.  It

11  doesn't take much sophistication to come by, walk in for 20

12  minutes and pick up a $1200 check.  He's not the one that set

13  up the shell corporations.  Their argument's going to be, well,

14  he had Arasa, and that's a shell corporation; and that is an

15  issue that I think the jury rejected because Arasa, the doctor

16  had a number of clinics, and all of the proceeds, from all of

17  his clinics, went into one which then paid the doctors.

18        So it wasn't so much that it was a shell corporation

19  hiding money, it was the mechanism -- if a doctor worked at two

20  different clinics, instead of having to get a check out of two

21  different clinics, it was one business that would write the

22  checks to all of the people associated with it.

23        So I don't think that would constitute using a

24  sophisticated means.  It is not sophisticated to pick up 1200

25  bucks.

1          THE COURT:  Isn't it sophisticated, under the

2   guidelines, to have three shell corporations?  The government

3   said something about a fourth one, but --

4          MR. AIKEN:  He didn't have three shell corporations.

5   Huici and Francisco had them.  One of which was formed, I

6   think, even before any of the transactions start taking place.

7          What happened was Francisco and Ernesto were

8   originally writing checks to cash.  They would cash the checks,

9   they were paying off -- according to the testimony, paying off

10  patients and then they were chopping up the balance.  And at

11  some point in time they changed that.  The government

12  attributes that to directions from the Doctor.  I think the

13  jury rejected that argument because they found him specifically

14  not guilty of that.  That that was all part of the money

15  laundering conspiracy and he was found not guilty of that.

16         And credibility is an issue, and that's one of the

17  places where the Court has a disadvantage in that you didn't

18  hear the testimony, you didn't see Francisco on the stand, you

19  didn't see Ernesto, and there is a way to judge their

20  credibility.

21         I appreciate the fact that they want to blame that on

22  the Doctor, but he had nothing to do with setting up those

23  corporations.  That was done by them and, I think, through

24  Iliana Rodriguez.  So they are setting up all that.  It had

25  nothing to do with the Doctor.  They are writing it there,

1   they're chopping it up, and they're splitting the money.  But

2   he had nothing to do with those.  The only corporation he had

3   was Arasa, and Arasa received the proceeds from all of his

4   clinics, and paid the doctors out of it.  It wasn't so much

5   that it was a shell, it was a very viable corporation.  His

6   wife was the owner of it, and it wasn't hidden.

7            One of the things that we brought out at trial, in my

8   cross-examination of Agent Tucker, when they were arguing the

9   money laundering, I said, well, how about $71,000 check coming

10  out of Arasa payable to, surprise, the United States of

11  America, the U.S. Treasury?  In other words, the taxes were

12  being paid through Arasa.  So it's pretty hard to argue that

13  that's money laundering when in fact it's going to the Internal

14  Revenue Service.

15           So Arasa -- our position to this day is Arasa is not

16  a shell corporation, it was a very real corporation, and it

17  functioned totally unlike the three shell corporations that

18  Huici and Diaz had, which they were then writing checks out of

19  there to every relative they knew, and chopping up the money.

20           So my position is that he should not get the

21  two-level bump for sophisticated means.

22           THE COURT:  All right.

23           Mr. Casas?

24           MR. CASAS:  Your Honor, in order for this conspiracy

25  to commit health care fraud to have worked, they had to have

1   the shell corporations in order to funnel the money out of

2   Xtreme Care to these individuals such as Francisco Huici and

3   Ernesto Diaz.  Through the evidence we presented at trial,

4   including testimony, as well as the documents we introduced at

5   trial, including the check registers, we proved that the

6   defendant was aware of these shell corporations.  Specifically,

7   Government Exhibit Number 40 consisted of check registers, Your

8   Honor.

9           And I kind of tried to describe these check registers

10  to the Court.  There are pages of checks.  Typically three

11  checks to a page, organized in a vertical manner.  Each check

12  creates a carbon copy after it's been written.

13          At trial, we introduced at least evidence of 15 pages

14  where the defendant wrote his own check to Arasa, signed by

15  him, above that were checks to Xtreme Advance Services, Huici

16  Services and Maintenance.  Those three were always the checks

17  that you saw for the larger amounts in that check register.

18  The other check amounts were typically lesser amounts involving

19  the payroll for the employees of Xtreme Care.

20          What we showed at trial was these -- and when I say

21  larger checks, I'm not talking about a thousand or two

22  thousand, we're talking checks upwards of 3,000, $4,000 on

23  these Xtreme Advance Services and Huici Services and

24  Maintenance.

25          When you think about the revenue that was generated

1    by Xtreme Care in 2010, 2011, and barely in 2012, and you think

2    about what the defendant received from that, approximately

3    $140,000, it makes sense, because that's the way this was

4    always set up to work.  These individuals, we can't let the

5    Agency for Health Care Administration know they are the true

6    owners; we need these shell corporations to hide that true

7    ownership so we create these shell corporations and we funnel

8    all the money out.  Okay?  They didn't do that from the get-go

9    and they had problems with the banks, as was testified at

10   trial, they shut the bank accounts down.  So they went with

11   these shell corporations for that purpose.

12        And, quite frankly, it worked during the course of

13   the investigation.  The banks didn't shut that down -- I don't

14   know -- I don't think that we asked the banks not to shut it

15   down; but they didn't shut it down to that extent, those other

16   bank accounts with the defendant's name associated with them.

17        That's not common.  It is a greater sophistication

18   than you would otherwise see.  Comparing it with Dr. Hall's

19   case, like I said, you know, that individual just wrote checks

20   to himself.  And this one, there was structuring of those

21   transactions between these shell corporations and other

22   individuals in order to not only pay themselves, but also for

23   tax purposes.  And the tax returns are in evidence, as well.

24   And so you have to consider that the defendant doesn't want to

25   pay the tax liability for money he doesn't get.  So how did

1   they do that?  Well, they expense all of this money that was

2   paid to these shell corporations in these tax returns so that

3   these tax returns show losses.  Xtreme Care Rehabilitation

4   Center, for the evidence presented at trial, showed losses in

5   its two years of tax returns that were prepared.  And it's also

6   substantiated at trial, this was information that the defendant

7   received.  So again, this was all done with the purpose in mind

8   to keep the general public, insurance companies, the Agency for

9   Health Care Administration, in the dark about who was, or were,

10  the true owners of this company.

11          What Mr. Aiken brought up about taxes being paid by

12  the defendant, quite frankly, was outside of the timeframe of

13  this investigation, but interestingly, it related to 2006

14  payroll taxes for Arasa.  Not surprisingly, the defendant has,

15  and had, a lot of tax issues, and he owed a substantial amount

16  of payroll tax from Arasa.  That corporation that Mr. Aiken --

17  you know, he argues that it's not a shell corporation, and I'm

18  not going to take the position that it's a shell corporation

19  here today.  What I'm saying is, this belief that he was paying

20  his taxes as he was required to, those were back taxes, and

21  that was also testified to at trial by Agent Tucker, I believe.

22  Nevertheless, just bring that up to clarify that point

23  regarding his taxes.

24          But certainly, in this case, there was sophistication

25  in how the money was moved through Xtreme Care to others, and

1   we'd ask the Court to uphold that for that reason.

2         MR. AIKEN:  May I briefly respond, Your Honor?

3         THE COURT:  In a moment.

4         Does the Court have to find that Dr. Lovell was

5   responsible for instigating those financial arrangements, or

6   just that the conspiracy involved those kinds of financial

7   arrangements?

8         MR. CASAS:  I think the Court can find him

9   responsible if it finds the conspiracy created those

10  arrangements and that they were foreseeable.  I think there is

11  a foreseeability aspect to this, certainly, in getting that

12  money to these individuals.

13        There was certainly testimony at trial, as I

14  indicated, from Karen Jackson and Ernesto Diaz to the effect of

15  his direction in that money laundering activity.

16        THE COURT:  All right.  Mr. Aiken?

17        MR. AIKEN:  There are two separate and distinct

18  conspiracies.  The Government shows it and filed it that way.

19  One was the conspiracy for health care fraud.  And the other

20  was a conspiracy to money launder.  All of the arguments that

21  the prosecutor is making with respect to this all deal with the

22  conspiracy to money launder, which was the count that he was

23  found not guilty of.

24        What the jury reasonably concluded was that he was

25  part of the health fraud -- health care fraud conspiracy

1  because he let them use his license.  But they specifically

2  found him not guilty of everything else.  And all of that

3  argument about Arasa and all that was made, Arasa preexisted

4  this business.  It was formed back in 2006.  It's not a shell

5  corporation that was set up to syphon money out of Xtreme.  It

6  was formed four years prior to Xtreme ever being in existence.

7          What it did is it handled the money from the various

8  clinics and paid the doctors.  Out of the $140,000 that goes to

9  Dr. Lovell, he has to pay Dr. Morris, who is the doctor who is

10  there on the daily basis, and that dovetails back into my

11  follow the money argument.  If you follow the money, the Doctor

12  probably received somewhere close to five percent of the

13  proceeds, whereas Ernesto and Francisco probably received

14  somewhere close to 75 or 80 percent of the proceeds, the

15  difference being in expenses.  But that goes also -- all of

16  these arguments dovetail back into what was going on at trial,

17  and what was coming in, in terms of evidence.

18          But I don't think the arguments they're making now

19  apply -- they apply to the money laundering conspiracy, and

20  that's the one he was acquitted of.  And all the substantive

21  counts dealing with money laundering, all the stuff with Arasa,

22  all the bank transactions, all the specific -- everything that

23  they're saying, he was acquitted of.

24          THE COURT:  Going back to the organizer or leader

25  issue, as I understand Mr. Casas, one of the things he's saying

1  is that because your client was an organizer, even if he wasn't

2  a leader afterwards, he still gets tagged with the enhancement.

3          MR. CASAS:  I'm sorry, are you addressing me or

4  Mr. --

5          THE COURT:  No.  Mr. Aiken.

6          MR. CASAS:  I apologize.  I thought you said

7  Mr. Casas.

8          THE COURT:  I did say that.

9          MR. CASAS:  Oh, okay.

10         THE COURT:  I'm trying to summarize your argument.  I

11  was going to ask you if I'd done it right.  Is that right?  I

12  mean, is your position that if a defendant was an organizer in

13  this conspiracy, but was not a leader thereafter, he still gets

14  tagged with the organizer/leader enhancement?

15         MR. CASAS:  Certainly, Your Honor.  Certainly.  And

16  again, the evidence at trial, as testified by Karen Jackson,

17  Ernesto Diaz, the agreement was Karen Jackson had to work at

18  the clinic.  He made that decision.  That is part of the

19  organizational aspect of that too.  And I left that out.  But

20  he makes that choice.  And the reason he makes that choice is

21  because she had already worked at Latin Rehabilitation Center,

22  and she knew how things worked.  And she could step right in.

23         These other people?  No experience in health care

24  whatsoever.  None.  Zero.  They brought nothing to the table

25  except for money.

1    But I do agree with the Court, you can find him as an

2    organizer without finding he led thereafter and it would still

3    apply.

4          THE COURT:  Did you find any cases along those lines?

5    I mean, normally, it's not quite that compartmentalized, I

6    guess, is my memory of the cases.  Normally you have someone

7    who if they are an organizer they are also a leader because

8    they keep going with the conspiracy and the activities.

9          MR. CASAS:  Oh, he certainly kept going with it.  But

10   if you want to distinguish him as leading it or not leading it,

11   I think that's just semantics.  You can't survive in this

12   conspiracy without the defendant's license.  His license is

13   what keeps it going.  If that license gets pulled, then they've

14   got to find somebody else.

15         The defendant is -- whose name appears on all of the

16   paperwork.  The defendant is the one who has to show up for the

17   depositions.  He is the cornerstone, as I said, that first

18   block of construction for Xtreme Care.  Now, whether you deem

19   that a leader in a sense, again, I think it's semantics.  He

20   certainly was there for the creation of it and stayed with it

21   until the end.

22         MR. AIKEN:  In looking back at my notes on Karen

23   Jackson's testimony, and my notes are obviously not 100 percent

24   accurate, but it says, "We opened a business, the purpose was

25   to get money.  Ernesto was my husband.  We needed a doctor.

1   The doctor was Lovell.  I knew the doctor.  I asked him to open

2   a clinic.  I was the one who knew him.  We met at Wendy's.

3   Francisco, Lovell, Ernesto, and me, and discussed how to open

4   the clinic."  So it is Karen Jackson, who is the wife of

5   Ernesto, who is coming forward and saying let's open a clinic,

6   my husband and Francisco want to go into business; it was not

7   the doctor that organized it.  He had just something they

8   needed.  What he had was the license.  But he's not the

9   organizer.

10          I mean, they then go on:  We got the equipment from

11  Miami.  Francisco bought the equipment, opened the bank

12  account.  I mean she was the signator.  Ernesto said he went to

13  the city.  We decided how much to pay.  We bought everything.

14  It's we, we, we, we, we.  He had something they needed.  And

15  there's a difference between being a member of the conspiracy

16  and otherwise.

17          And I am not suggesting the Court split the baby, but

18  there's a four-level bump there.  You can come in at a

19  two-level if you find that he doesn't warrant the full four.

20  But I don't think he warrants any of the four levels for being

21  the organizer or leader.  He wasn't.  He had a license.

22          MR. CASAS:  The only thing I would respond, per the

23  transcript, Your Honor, is I asked Mrs. Jackson, again,

24  Document 375, now -- and this is in reference to their meeting,

25  at Page 18:  "Now what were you asking?"

1          She responded, "What we need to open up.  If we need

2     to open up a corporation we talk about the name.  It was a

3     small meeting.  We only last like 30 minutes, no more than

4     that."

5          "And did Dr. Lovell provide you responses?"

6          Answer, "Yes."

7          Question, "And what did he tell you?"

8          Answer, "He told me that in order me to open up the

9     clinic, I was supposed to be the office manager because he

10    trusts me.  He knows me from my other job.  So he told me that

11    I was supposed to be the office manager."

12         Question, "Did you have any experience as an office

13    manager?"

14         "Never."

15         Question, "Did you know how to run this type of

16    business?"

17         "No."

18         "Did Ernesto Diaz," on Page 19, "have any experience

19    in this business?"

20         "Not at all."

21         "And this business was what?"

22         "A clinic."

23         Question, "Chiropractic clinic?"

24         "Yes, sir."

25         And again, I just went through the other

1   co-conspirators not having experience.  That is the meeting

2   that was discussed that is the foundation of the creation of

3   Xtreme Care.  And again, it's the basis of the conspiracy to

4   commit health care fraud.

5          THE COURT:  And, Mr. Casas, what do you suggest I do

6   with the acquittals on the substantive count, in terms of

7   resolving the issues that we've been talking about for the last

8   couple hours?

9          MR. CASAS:  Your Honor, I don't think that the

10  acquittals in any way undermine the Court's findings with

11  regards to these guideline considerations.  Because certainly,

12  the Court's threshold of evidence for those guideline

13  determinations is a much lower standard than it is at trial.

14  And certainly Mr. Aiken would likely agree with me on this, the

15  jury compromised, and we don't know exactly all of their

16  deliberations, and what their basis of compromise, you know,

17  was, but the fact is they compromised.  Was there credible

18  evidence sufficient for the Court to make the findings with

19  respect to these enhancements that was presented at trial?

20  Absolutely.  And we've cited that to the Court here today, just

21  because he was acquitted of substantive offenses and the

22  conspiracy to commit money laundering doesn't undermine these

23  enhancements to the guideline.

24          And I think the Court has to accurately -- accurately

25  calculate the guideline regardless of the acquittal or not.

1   And certainly the Court knows there's a myriad of 11th Circuit

2   case law that even acquitted conduct can be the basis of

3   relevant conduct, and certainly relevant conduct relating to

4   all of these respective enhancements that we're talking about

5   here today, even though, again, the conspiracy to commit health

6   care fraud is where this all starts.  That is the start of

7   this.  So that's my response in that regard, Your Honor.

8          MR. AIKEN:  That compromise that counsel refers to

9   was 95 percent not guilty.  And they had the benefit of

10  weighing the credibility of the witnesses and seeing them

11  testify.  I mean, Francisco at one point on cross-examination

12  says, I'll say whatever you want.  I mean, we went into great

13  detail of the various considerations that they had received.

14         And the jurors, as the triers are fact -- originally,

15  I think they came back indicating they were hung and then came

16  back 95 percent not guilty.  So I think that they did get it

17  correct on a lot of these issues.  I think they found him

18  guilty of what he was guilty of, which was letting them use the

19  license.

20         THE COURT:  All right.  Anything else with regard to

21  the sentencing guideline issues?

22         MR. AIKEN:  No, Your Honor.

23         THE COURT:  All right.  I have read parts of the

24  transcript, primarily the parts cited by the Government; but I

25  think I need to read the whole transcript, since I did not

1    preside over the trial.

2              Mr. Aiken, obviously I'm not going to do that today.

3    Do you have anyone present in the courtroom who you wish to

4    have address the Court that is not available at a later date?

5              MR. AIKEN:  I don't, Your Honor.  I know the

6    defendant obviously wants to address the Court.

7              Do you have family members who want to address the

8    Court?

9              THE DEFENDANT:  Not at this time.  They will be here

10   at any other time, Your Honor.

11             THE COURT:  All right.  If you have someone who can't

12   make it, we'll take them today; but otherwise, like I said, I

13   want to read the entire transcript.

14             (The Court confers with the courtroom deputy.)

15             THE COURT:  Let me check my calendar in terms of

16   availability.

17             (The Court confers with the courtroom room deputy.)

18             THE COURT:  Counsel, I would like to reschedule this

19   for next Tuesday, at 2:00 o'clock.  I say I would like to do

20   that because I'm starting a trial tomorrow that I don't think

21   is going to be -- let me say that differently.  I think we'll

22   be done by then.  But I suppose I can't guarantee that for

23   sure.  What is your respective availabilities?

24             MR. CASAS:  I'll make myself available, Your Honor.

25   That's not an issue.

1        The Court said, "Review the transcript."  To my

2   knowledge, the entire transcript is not available, or has not

3   been transcribed.

4        THE COURT:  What's available?

5        MR. CASAS:  I have a copy of what is available, and

6   that is the testimony of Karen Jackson, Jeanine Huici, Ernesto

7   Diaz, Francisco Huici, Dennis LaRosa, William Paul, and the

8   cross-examination of Brian Tucker.

9        THE COURT:  Is there any of that -- well, is there

10  anything other than that those transcripts that relate to the

11  sentencing and guideline enhancement that we have been

12  discussing?

13       MR. CASAS:  There were certainly a substantial amount

14  of testimony as it relates to the shell corporations by way of

15  the testimony of Agent Tucker and Agent Silco.  It's my

16  recollection.  But I would suppose it would just depend on if

17  the Court came back with any questions.  And I could certainly

18  present oral testimony if the Court had any questions that

19  needed answering factually.

20       THE COURT:  Well, to the extent that you give me the

21  transcript of the cross-examination of a witness without the

22  direct, and there is something you need on the direct, I won't

23  have it; so that hurts you, and not the defendant.

24       MR. CASAS:  I understand, Your Honor; but I just

25  wanted to let the Court know that, because you said you were

1    going to review the transcript and I think --

2              THE COURT:  I actually thought it had all been

3    prepared.  Maybe I was just under the impression that you had

4    ordered some of it but not all of it.

5              MR. CASAS:  Mr. Aiken ordered some, I ordered some.

6    Whether it's all prepared, I don't know, but that's what I know

7    that's in the docket.

8              THE COURT:  Mr. Aiken, do you have any sense as to

9    whether it's all prepared or how much of it is prepared?

10             MR. AIKEN:  I don't.  The majority of it I think has

11   been ordered by the Government.  I think the only thing we

12   ordered was the cross-examination of Agent Tucker.  We have

13   that.  That was the difficulty that I encountered.  I think I

14   had originally filed a motion suggesting that Magnuson, since

15   he presided over the trial, it would have just been a thousand

16   times easier; but I understand the logistics there, and we are

17   where we are.

18             THE COURT:  Yeah.  I mean, I would have preferred it

19   too, but other issues as to his availability.

20             MR. AIKEN:  I understand.

21             THE COURT:  Let me take a look at what record we have

22   and see if there's anything -- I mean, if I can decide on that,

23   I will.

24             MR. AIKEN:  The only problem is, if you look at the

25   arguments that are made at trial, because I mean we've got

 1  openings and closings and everything else, I mean because a lot

 2  of the positions here are sort of contrary to the positions

 3  taken then.

 4          THE COURT:  Nothing says you have to be consistent.

 5          MR. AIKEN:  I know.  I agree.

 6          THE COURT:  Nothing says the Government has to be

 7  consistent.

 8          MR. AIKEN:  I understand.

 9          THE COURT:  I don't care what the argument was, it's

10  the evidence that I'm concerned with.

11          MR. AIKEN:  I understand, Your Honor.  I understand.

12          THE COURT:  All right.

13          MR. AIKEN:  What time did you have set aside for the

14  13th, Your Honor?

15          THE COURT:  I'm thinking 2:00 o'clock.

16          MR. AIKEN:  I have a depo of an elderly gentleman set

17  at 10:00 o'clock in the morning, but I'll talk to the

18  prosecutor and see if I can get it moved up earlier in the

19  morning and I'll still be here by 2:00 o'clock.

20          THE COURT:  All right.  And if my trial is going

21  we'll let you know as soon as we know but, like I said, I'm

22  hoping that that trial will be over.  It's a civil case,

23  so . . . .

24          MR. AIKEN:  Do you have anything available on the

25  14th or 15th?  Because I have both those days wide open.

1        THE COURT:  Well, I thought I had the 15th.  I've got

2   a 10:30 until about 2:00 o'clock on the 14th.

3        MR. AIKEN:  Would the Court consider that day as

4   opposed to the 13th?  Because I know it's an elderly gentleman

5   in a financial fraud case, and we are taking his deposition to

6   perpetrate testimony.

7        THE COURT:  How long is it going to take?

8        MR. AIKEN:  I don't know.  He's ninety-some years

9   old.

10        THE COURT:  Well . . . .

11        MR. AIKEN:  But it's in Sarasota, and set for 10:00

12   in the morning.  Assuming I can get out of there by 12:00 I can

13   make it down here.  That gives me two hours.

14        THE COURT:  I see you have some travel time.

15        MR. AIKEN:  I've got about an hour and a half travel

16   time in there.  So if the Court could set me on the 14th, I've

17   got the whole day open.

18        THE COURT:  I've got travel to get back from where

19   I'm supposed to be.  Might be able to do it by 2:00 o'clock,

20   but I mean, if it's 2:15, you would all have to wait.

21        MR. AIKEN:  That's not a problem.

22        THE COURTROOM DEPUTY:  The 14th?

23        THE COURT:  On the 14th.

24        THE COURTROOM DEPUTY:  I don't have you anywhere.

25        THE COURT:  This is a secret.  You just think you

1  have everything on my calendar.

2              THE COURTROOM DEPUTY:  No, I know I don't.

3              MR. AIKEN:  I think we're probably 90 percent through

4  the sentencing proceedings, so it shouldn't take that long that

5  afternoon.

6              THE COURT:  Yeah.  All right.  The 14th at 2:00

7  o'clock, then.

8              MR. AIKEN:  Very good, Your Honor.

9              THE COURT:  As long as you give me a little slack if

10  I need it in terms of promptness.

11              MR. AIKEN:  I won't hold in you contempt.

12              THE COURT:  All right.  I appreciate that.

13              All right.  2:00 o'clock on the 14th.

14              MR. AIKEN:  Thank you, Your Honor.

15              THE COURT:  We'll be in recess.

16                    -- -- -- -- -- -- -- --

17              (At 4:58 p.m., court was recessed, to be reconvened

18        at 2:00 p.m., on Wednesday, August 14, 2013.)

19                    -- -- -- -- -- -- -- --

20

21

22

23

24

25